J-A16021-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ELIZABETH GARSTECKI, AS ADMINISTRATRIX OF THE ESTATE OF RHODA BALDWIN, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ASTER ASSEFA, M.D.; ASTER ASSEFA, M.D., P.C.; AND MEDICAL LABORATORY SERVICES, INC., D/B/A DIAMOND PHARMACY | |
| Appellees | No. 1222 WDA 2015 |

Appeal from the Judgment Entered August 3, 2015
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s): 4251 of 2012

BEFORE:  SHOGAN, OLSON and STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED NOVEMBER 17, 2016**

Appellant, Elizabeth Garstecki, as administratrix of the estate of Rhoda Baldwin, deceased, appeals from the judgment entered on August 3, 2015. We affirm.

On July 11, 2012, Appellant filed a complaint naming, as defendants, Aster Assefa, M.D., Aster Assefa, M.D., P.C., and Medical Laboratory Service, Inc., d/b/a Diamond Pharmacy (hereinafter collectively "Defendants"). The complaint raised wrongful death and survival claims and, in the complaint, Appellant averred the following.

In 2001, defendant Dr. Aster Assefa (hereinafter "Dr. Assefa") became the primary care physician of Rhoda Baldwin (hereinafter "Ms. Baldwin"). At

*Retired Senior Judge assigned to the Superior Court.

the time, Ms. Baldwin "was in a general state of good health with mild mental retardation." Appellant's Complaint, 7/11/12, at ¶¶ 7-8.

In 2009, Ms. Baldwin "was diagnosed with dilated cardiomyopathy, a condition that required [her] to be treated with [warfarin], also known as Coumadin, to decrease the risk of developing ischemic stroke." *Id.* at ¶ 9. As Appellant averred, following the diagnosis, Dr. Assefa prescribed Ms. Baldwin Coumadin and managed the international normalized ratio ("INR") levels of Ms. Baldwin's blood, in an attempt to safely provide Ms. Baldwin with a therapeutic level of the drug. *See id.* at ¶¶ 10-11. Appellant averred:

> 13. On August 12, 2010, [Ms. Baldwin's prothrombin time ("PT") and INR] were still below the therapeutic level.
>
> 14. In response, [Dr. Assefa] changed [Ms. Baldwin's] Coumadin dosing to 10 mg on Monday, Tuesday, Wednesday and Friday and 7.5 mg on all other days of the week. The total weekly dose of Coumadin intended was 62.5 mg.
>
> 15. This prescription change, if communicated to [Ms. Baldwin,] took place by means of a telephone conversation.
>
> 16. On August 17, 2010, [Dr. Assefa] wrote a prescription as: "Warfarin Sodium 7.5 mg tablet. Take one tablet by mouth as directed. Refills 5. Quantity 30."
>
> 17. On August 17, 2010, [Dr. Assefa] wrote a second prescription as: "Warfarin Sodium 10 mg tablet. Take one tablet every day as directed. Refills 5. Quantity 30."
>
> 18. [Ms. Baldwin] presented these prescriptions to [defendant Diamond Pharmacy,] which filled the prescriptions and labeled the bottles as:

a) "Warfarin Sodium 7.5 mg tablets.  Take one tablet by mouth as directed[]"; and

b) "Warfarin Sodium 10 mg tablets.  Take one tablet every day as directed."

19. [Ms. Baldwin] followed the instructions on the pill bottles and took 7.5 mg tablets on Thursday, Saturday and Sunday and 10 mg tablets every day.

20. The total weekly Coumadin dose taken by [Ms. Baldwin,] who was following the pill bottle instructions[,] was 92.5 mg.

*Id.* at ¶¶ 13-20.

Appellant averred that, on August 26, 2010, Ms. Baldwin visited with Dr. Assefa "in order to obtain pre-operative clearance for cataract surgery." *Id.* at ¶ 21.  During this visit, Dr. Assefa "did not address [or] discuss [Ms. Baldwin's] anticoagulation" and Dr. Assefa did not order an INR test.  *Id.* at ¶¶ 22-23.

As Appellant averred, on September 1, 2010, Ms. Baldwin "awoke screaming in pain and speaking incoherently." *Id.* at ¶ 24.  Ms. Baldwin was then taken to the hospital, where she was diagnosed with a "diffuse hemorrhage throughout the midbrain, anterior pons and right cerebellar peduncle" and with an INR that was "extremely elevated at 7.3." *Id.* at ¶¶ 25-26.  That day, Ms. Baldwin died from "an intracranial hemorrhage caused by excessive Coumadin overdose." *Id.* at ¶ 27.

Within Appellant's complaint, Appellant claimed (among other things) that Dr. Assefa was negligent in "writing a prescription order that was

wrong, confusing and misleading" and "writing a prescription order that prescribed and caused an overdose of medication." *Id.* at ¶ 33(j) and (k).

Prior to trial, Appellant filed two motions *in limine*, wherein Appellant sought to preclude evidence that, prior to August 17, 2010, Ms. Baldwin had been non-compliant with her prescription medication instructions. *See* Appellant's Motion *in Limine* to Exclude Character Evidence of Rhonda Baldwin's Past Failure to Follow Prescription Instructions, 2/20/15, at 1-3; Appellant's Motion *in Limine* to Exclude Expert Reports of Dr. Chris T. O'Donnell and Dr. Anthony F. Pizon, 2/20/15, at 1-5. According to Appellant, such evidence was inadmissible under Pennsylvania Rule of Evidence 404(a)(1), as the evidence was only relevant to prove that Ms. Baldwin's "past failure to follow prescription instructions [demonstrated that] she would have acted in the same manner when being prescribed [Coumadin] during this incident." Appellant's Motion *in Limine* to Exclude Character Evidence of Rhonda Baldwin's Past Failure to Follow Prescription Instructions, 2/20/15, at 2. Thus, Appellant claimed, "any evidence of Ms. Baldwin's past failure to follow prescription instructions is inadmissible to prove she would have acted in accordance with this character trait during the time at issue, which includes proving her comparative negligence." *Id.* at 3.

On May 11, 2015, the trial court denied Appellant's motions *in limine* and the parties proceeded to trial. During trial, Appellant put forth evidence that "Dr. Assefa and her office fell below th[e] standard of care in issuing the

wrong [Coumadin] prescription, in not clarifying for [Ms. Baldwin] exactly what she wanted [Ms. Baldwin] to take when she changed [Ms. Baldwin's] prescription and then in not following up with [Ms. Baldwin] when [Ms. Baldwin] came back in when she had the chance to find her mistake and see what was going on with the patient and monitor her correctly." *See* N.T. Trial, 5/12/15, at 20.[1]  With respect to these issues, Appellant presented the testimony of Dr. Robert L. Perkel, whom the trial court accepted as an expert in the field of family practice medicine. *Id.* at 99.  Initially, Dr. Perkel testified regarding:  the effects of Coumadin; Ms. Baldwin's atrial fibrillation and her need for Coumadin; the proper therapeutic level of the drug; and, the dangers inherent in taking Coumadin.  As Dr. Perkel testified:

> Coumadin or warfarin is, simply put, a blood thinner.  If you cut yourself [on] your arm, [] the higher the dose of Coumadin you're taking and the higher the INR, the more difficult it is to stop the bleeding.  In simple parlance, it is a blood thinner.
>
> . . .
>
> It's a blood thinner.  It stops the blood from clotting at some level.  And while if you don't have an underlying medical problem, it's not a good idea to have your blood too thin.  If you do happen to have a particular type of medical problem, you reduce the chances of that underlying medical

---

[1] During Appellant's case in chief, Appellant presented no evidence that defendant Diamond Pharmacy was negligent.  Further, after the evidentiary portion of the trial concluded (and over the objections of defendants Dr. Assefa and Aster Assefa, M.D., P.C.), the trial court granted a directed verdict in favor of defendant Diamond Pharmacy.  N.T. Trial, 5/14/15, at 578-582.

problem causing major league trouble if you take Coumadin at an appropriate dose and have your blood thinned to the appropriate level.

. . .

. . . [Ms. Baldwin] had atrial fibrillation and irregular heartbeat. . . . [T]here's no rhyme or reason for an irregular heartbeat. So, why is that bad? Because if you have an irregular heartbeat and it's not regularly irregular . . . [i]t sets up currents in the heart.

The heart, after all, is a cavity that has blood, liquid, and you're supposed to have smooth laminar flow through the heart. But when you set up funny currents, called eddy currents, it's like looking in a stream of a whirlpool. [It] gets pooled and that can cause the blood to clot.

When the blood clots on the valves on the inside wall of the heart, it forms a clot. And with the disordered regulation of the heartbeat, it can flop off the thrombus or clot that travels up to the brain through the carotid circulation and becomes a sudden stroke. . . .

So we use blood thinners in order to cut down on the clot or the thrombus on the valves and wall in the heart. . . .

In a nutshell, that's anticoagulation. The art of using Coumadin is science and art. You have to be careful. You have to be precise. You have to be exact.

. . . You and I, if we're not taking Coumadin, have an INR [of] 1.0, 1.1[,] something like that. For each milligram of Coumadin you go up, the INR goes up. . . . [W]ith . . . atrial fibrillation of the heart, we're aiming for a thinning amount of 2.0 to 3.0.

. . .

[K]eep in mind that 2.0 to 3.0 is our goal. Below 2.0 there's an increase[d] chance of the patient forming clots. Clots are not good. Greater than 3.0 there is an increase[d] chance of bleeding. Bleeding is not good.

So it's a balancing act between giving enough Coumadin to get them over 2.0 but yet not too much Coumadin to get them up above 3.0.

And I guess the last piece I would say here in an introduction to blood clotting is that it's clear, the scientific evidence is clear that bleeding risk goes up as the INR goes up. And the magic number to keep in mind is about an INR of 4.5. . . . 4.5 [is] a kind of magic number where serious and severe bleeding starts to increase dramatically, keep in mind that at the time of her hospitalization with the stroke on September 1st, [Ms.] Baldwin [had] a measured INR of 7.3. That is dangerous territory for bleeding.

*Id.* at 101-106.

Dr. Perkel also testified regarding the "art and science" of prescribing Coumadin and achieving, in the patient, a therapeutic and safe INR of between 2.0 and 3.0:

So, in this case, the correct diagnosis was offered of atrial fibrillation and cardiomyopathy. And cardiologists in the hospitalization assumed the INR monitoring, appropriately started the patient on Coumadin to achieve an INR of 2.0 to 3.0.

. . . Now the hard part is actually how do you dose [the Coumadin], how do you do it?

You start at low Coumadin doses like was done in this case, 3 milligrams a day, 5 milligrams a day[,] whatever. Then you bring the patient back at frequent intervals. Usually when you start Coumadin, twice a week. You measure the INR. You get the INR back. You adjust the Coumadin dose.

You bring – if you're therapeutic at 2.0 to 3.0, if you're subtherapeutic, below 2.0 as was the case here early on, 1.0, 1.1, you bring the patient back. You increase the Coumadin dose. We usually start by increasing about 10 to 15 percent the weekly dose.

You add up all the doses over seven days, you get a number. You take ten percent of that number and you increase one or two of the daily doses in order to get a ten percent rise in the weekly dose. You measure the INR once or twice a week or once a week until you reach a therapeutic INR of 2.0 to 3.0.

So you keep doing that, you keep responding, going up and up slowly and carefully because you don't want to get them too much Coumadin. Because remember, you're on the bleeding end of the problem. And if you don't give enough Coumadin, you're on the clotting end of the problem.

So it is an art based in science on that magic number of about ten percent. As long as the INR isn't too low or if the INR isn't too high, you can decrease by ten percent if you're a bit over. You keep doing that until you reach a therapeutic level of between 2.0 and 3.0.

And then what most people like to do is get about weekly or every other week INR for the next couple of blood draws until you see that the patient is kind of in a steady state with keeping that INR therapeutic, between 2.0 and 3.0, and then you can drop down to safely doing INRs once a month.

*Id.* at 106-109.

As Dr. Perkel testified, Ms. Baldwin began taking Coumadin in January 2010 and, from January 2010 until August 2010, Dr. Assefa managed Ms. Baldwin's Coumadin dose and INR appropriately. *Id.* at 118. Specifically, Dr. Perkel testified, since Ms. Baldwin's INR was subtherapeutic during the period from January to August 2010, Dr. Assefa properly (and gradually) increased Ms. Baldwin's Coumadin dose from 21 milligrams per week to, eventually, 57.5 milligrams per week. *Id.* at 116-121.

Dr. Perkel testified that, on August 9, 2010, Ms. Baldwin came in to Dr. Assefa's office for another appointment and Dr. Assefa ordered that Ms.

Baldwin take another blood test to discern her INR level. Ms. Baldwin did so and, on August 12, 2010, it was revealed that Ms. Baldwin's INR was 1.6 – and, thus, still subtherapeutic. *Id.* at 127. Therefore, Dr. Perkel testified, a medical assistant at Dr. Assefa's office telephoned either Ms. Baldwin or Ms. Baldwin's husband and told the person, over the telephone, that Dr. Assefa was prescribing an increase in Ms. Baldwin's Coumadin dose, from 57.5 milligrams weekly to 60 milligrams weekly. *Id.* at 128-129. Dr. Perkel testified that this four percent increase in Ms. Baldwin's Coumadin dose was "conservative" and within the standard of care. *Id.* at 128 and 130.

However, Dr. Perkel testified, Dr. Assefa violated her standard of care on August 17, 2010. As Dr. Perkel testified, on this date, Dr. Assefa gave a written Coumadin prescription to Ms. Baldwin's husband – with the apparent intention of repeating the "dose adjustment that was made by telephone on August 12th." *Id.* at 130. Although Dr. Perkel acknowledged that he "never [saw] those written prescriptions," Dr. Perkel testified:

> the way [the prescription] was written by the pharmacist, interpreted by the pharmacist, taking it from the written prescription from Dr. Assefa, was now written as 7.5 milligram [Coumadin] tablets . . . taken by mouth as directed. And the second prescription was [Coumadin] 10 milligram tablets, one tablet taken every day as directed.
>
> . . .
>
> Does that mean the same 7.5 that she had been taking Tuesday, Thursday, Friday, Saturday, Sunday, in the form of one and a half five milligram tablets? That's the way I would interpret it. And the way I would interpret 10 milligram tablet size, it's written one tablet taken every day

as directed means you now take a 10 milligram tablet every day.

If you look at that prescription, the way it was written and the way I think it's fair to interpret it, the math is going from 60 milligrams a week, which is what the telephone instructions were [on August 12, 2010], to a whopping 100 milligrams per week based on a fair interpretation of the way those labels read.

This is a lady who has an INR of 1.6. Not quite therapeutic. That represents a 67 percent increase in the weekly Coumadin dosing if you give it the most conservative interpretation of how that label was to be read.

If, on the other hand, the patient reads the label as 7.5 milligrams taken as directed to mean that you're also supposed to take 7.5 milligrams every day, in addition to 10 milligrams every day, . . . that gets us to 122.5 milligrams per week up from 60. That represents a 104 percent increase in Coumadin.

I know that's not what Dr. Assefa intended. No doctor in their right mind would write for either a 67 percent increase per week or a 104 percent increase per week when you have a patient already taking Coumadin who got an INR of 1.6. No right thinking doctor would do that. . . . But sadly, in my estimate, that is a fair reading of the way the label got produced taken from the written prescription, because I don't think it's likely that the written prescription was as precise as it needed to be about stating . . . one 10 milligram tablet Monday, Wednesday and Friday and one 7.5 milligram tablet Tuesday, Thursday, Saturday and Sunday.

*Id.* at 131-133.

Moreover, Dr. Perkel testified that Dr. Assefa violated the standard of care on August 18, 2010. On that date, pharmacist Andrea Billey, of Diamond Pharmacy, telephoned Dr. Assefa's office to ensure that Ms. Baldwin's written prescription was correct. *Id.* at 58. After speaking to a

"Lisa" at Dr. Assefa's office, Ms. Billey testified that she "clarified" that the written prescription was correct – and Ms. Billey then dispensed the Coumadin to the Baldwins, with the written instructions: "Warfarin Sodium 7.5 mg tablets. Take one tablet by mouth as directed[]" and "Warfarin Sodium 10 mg tablets. Take one tablet every day as directed." *Id.* 58-59 and 72.

Finally, Dr. Perkel testified that Dr. Assefa violated the standard of care on August 26, 2010 – when Dr. Assefa provided Ms. Baldwin with medical clearance to receive cataract surgery. According to Dr. Perkel, Dr. Assefa should not have medically cleared Ms. Baldwin for this elective surgery without first testing for and knowing Ms. Baldwin's current INR. *Id.* at 142-145.

During Defendants' case in chief, Defendants presented evidence that Ms. Baldwin had a history of poor compliance with taking her prescription medications, including her prior Coumadin prescriptions. Defendants used this history of poor compliance to first demonstrate that, even if Dr. Assefa was negligent in writing the August 17, 2010 prescription and in communicating with the pharmacy on August 18, 2010, the negligence did not cause Ms. Baldwin's harm because a variety of things could have caused Ms. Baldwin's INR level to spike and Ms. Baldwin's "poor medical compliance makes predicting the exact warfarin dose prior to her death virtually impossible." N.T. Trial, 5/13/15, at 361-362 and 368. Indeed, Defendants presented the expert medical testimony of Dr. Anthony Pizon and Dr. Pizon

testified that, because of Ms. Baldwin's history of poor compliance with taking her prescribed Coumadin doses, Ms. Baldwin's INR could have spiked to 7.3, even if Ms. Baldwin was taking the 60 milligrams of Coumadin per week that Dr. Assefa orally prescribed on August 12, 2010 – and that Appellant's own expert testified was a dosage that fell within the standard of care. *Id.* at 348-349; N.T. Trial, 5/12/15, at 128 and 130.

Further, Defendants used Ms. Baldwin's history of non-compliance to demonstrate that Ms. Baldwin was contributorily negligent in causing her harm. With respect to this point, Defendants presented the expert testimony of Dr. Christopher O'Donnell. Dr. O'Donnell testified that Ms. Baldwin's history of failing to take her prescribed doses of Coumadin placed her "at risk of complications either from undertreatment or overtreatment," which, Dr. O'Donnell testified, is especially dangerous when dealing with Coumadin because it "is so important to [achieve] a proper dose" of the drug. N.T. Trial, 5/14/15, at 453-454.

In addition, Dr. O'Donnell specifically testified that, in his opinion: "Dr. Assefa managed the Coumadin therapy to the best of her ability given the circumstances of the case;" Dr. Assefa was not negligent "in any aspect of her treatment;" and, Dr. Assefa could not have done anything that would have prevented Ms. Baldwin's death. *Id.* at 448 and 468.

After the evidence was presented, the parties proceeded to a charging conference where Dr. Assefa and Aster Assefa, M.D., P.C. requested a comparative negligence instruction.[2] *Id.* at 589. The trial court granted the request over Appellant's objection and, during the jury charge, the trial court instructed the jury on comparative negligence. *Id.* at 589-591 and 648.

The trial court then submitted to the jury a general verdict slip with special findings. The verdict slip read:

**<u>VERDICT SLIP</u>**

**Question 1:**
    Was Dr. Assefa/Aster Assefa, M.D., P.C., negligent?
             Yes _____    No _____

    If you answered Question 1 "Yes", proceed to Question 2.

    If you answered Question 1 "No", Plaintiff cannot recover and you should not answer any further questions. Tell the court officer you have reached a verdict.

**Question 2:**
    Was the negligence of Dr. Assefa/Aster Assefa, M.D., P.C., a factual cause of any harm to the Plaintiff?
             Yes _____    No _____

    If you answered Question 2 "Yes", proceed to Question 3.

_____

[2] Again, after the evidentiary portion of the trial concluded, the trial court granted a directed verdict in favor of defendant Diamond Pharmacy. N.T. Trial, 5/14/15, at 578-582.

If you answered Question 2 "No", Plaintiff cannot recover and you should not answer any further questions. Tell the court officer you have reached a verdict.

**Question 3:**
Was Rhoda Baldwin negligent?
Yes _____    No _____

If you answer Question 3 "Yes," go to Question 4.

If you answer Question 3 "No," go to Question 6.

**Question 4:**
Was Rhoda Baldwin's [sic] a factual cause of any harm to her?
Yes _____    No _____

If you answered Question 4 "YES,"[] proceed to Question 5[.]

If you answered Question 4[] "NO," proceed to Question 6[.]

**Question 5:**
Taking the combined negligence that was a factual cause of any harm to Rhoda Baldwin as 100 percent, what percentage of that negligence do you attribute to each party?

Dr. Assefa/Aster Assefa, M.D., P.C.          _____%

Rhoda Baldwin                                        _____%

**Question 6:**
State the amount of damages sustained by the plaintiff for:

Survival Action:                              $_____

Wrongful Death Action:                    $_____

Verdict Slip, dated 5/14/15, at 1-2.

On May 14, 2015, the jury arrived at its verdict. In open court, the jury announced "no" to "Question number [one], was Dr. Assefa slash Aster Assefa, M.D., P.C. negligent?" N.T. Trial, 5/14/15, at 673. Moreover, the jury's signed verdict slip reflects the announced verdict: the jury checked "No" to "Question 1" and, in accordance with the instructions, did not proceed further. *See* Verdict Slip, dated 5/14/15, at 1-2.

Appellant filed a timely post-trial motion[3] and, within the motion, Appellant claimed that the trial court erred in denying the motions *in limine* she filed, wherein she sought to preclude evidence that, prior to August 17, 2010, Ms. Baldwin had been non-compliant with taking her Coumadin medications. Appellant's Post-Trial Motion, 5/26/15, at 1-3. Specifically, Appellant's post-trial motion declares that the trial court committed error because:

> The defense was overwhelmingly based upon "character evidence" of [Ms. Baldwin]; specifically, that during the period from January 1, 2010 until August 17, 2010[, Ms. Baldwin] had been noncompliant with taking the exact prescribed dose of Coumadin during said period. The [d]efense argument was that because [Ms. Baldwin] had been non-compliant with earlier Coumadin prescriptions, a determination of how much Coumadin was taken subsequently was impossible to make. [Appellant] filed a motion *in limine* arguing that said evidence was improperly based on character evidence of [Ms. Baldwin] and was entirely irrelevant and prejudicial to the issue of whether [Ms. Baldwin] was prescribed an excessive dose of

---

[3] Appellant filed her post-trial motion on Tuesday, May 26, 2015. The motion was timely because Monday, May 25, 2015 was Memorial Day.

Coumadin on August 17, 2010, and whether [Ms. Baldwin] had an excessive amount of Coumadin in her blood at the time of her stroke on September 1, 2010. Said motion was denied and substantial evidence was offered based upon [Ms. Baldwin's] character of failing to take the prescribed dose during periods of time before the erroneous prescription was made.

The defense experts including Dr. Pizon, a toxicologist, based his entire opinion on character evidence of [Ms. Baldwin]. Specifically[,] Dr. Pizon testified that it was impossible to know how much Coumadin was in [Ms. Baldwin's] system despite an INR reading that was critically high, because [Ms. Baldwin] had shown a pattern of noncompliance prior to August 17, 2010. The same opinions were offered by [Appellant's] other expert Dr. O'Donnell who claimed that [Ms. Baldwin's] noncompliance with earlier prescription medications made it impossible to determine the amount of Coumadin in her system at the time of her fatal hemorrhagic stroke. [Appellant] filed motions *in limine* asking that the testimony of said experts be excluded since it was based upon the improper character evidence and said motion was denied.

*Id.* at ¶¶ 5-6.

On May 28, 2015, the trial court issued a scheduling order, declaring that Appellant's brief in support of her post-trial motion must be filed by June 16, 2015. Trial Court Order, 5/28/15, at 1. Appellant filed her brief in support of her post-trial motion on June 16, 2015. Within Appellant's brief in support, Appellant attempted to raise a claim of error that was not contained in her post-trial motion. The new claim of error concerned the trial court's comparative negligence jury charge and declared: "the trial court erred in admitting character evidence of Rhoda Baldwin's noncompliance with taking her medications, specifically from January 1, 2010 through August 17, 2010, and therefore also erred in charging the jury

on Rhoda Baldwin's comparative negligence." Appellant's Brief in Support of Post-Trial Motion, 6/16/15, at 5.

The trial court denied Appellant's motion by order entered July 29, 2015 and, following the August 3, 2015 entry of judgment, Appellant filed a timely notice of appeal.

On appeal, Appellant raises one claim:

> Whether the trial court erred in denying [Appellant's] post-trial motion for a new trial after the trial court admitted character evidence of Rhoda Baldwin's past noncompliance with taking her medications, and therefore, erred in charging the jury on Rhoda Baldwin's comparative negligence[?]

Appellant's Brief at 7.[4]

At the outset, Appellant waived any claim that the trial court "erred in charging the jury on Rhoda Baldwin's comparative negligence," as Appellant failed to include the claim in her post-trial motion. *See* Pa.R.C.P. 227.1(b)

_____

[4] Within the argument section of Appellant's brief, Appellant lists a second claim. The second claim declares: "the evidence of Rhoda Baldwin's past noncompliance does not rise to the level of admissible habit evidence, and it cannot be used to show a 'lack of habit' in taking medication because a lack of habit is equivalent to a character for not taking medication." Appellant's Brief at 22. Although this specific claim was not contained in Appellant's statement of questions involved on appeal, the claim is essentially subsumed within Appellant's first claim – that the trial court erred in "admit[ting] character evidence of Rhoda Baldwin's past noncompliance with taking her medications." Appellant's Brief at 7. Therefore, even though we will not separately discuss Appellant's second claim on appeal, the claim is not technically waived. *See* Pa.R.A.P. 2116(a) ("[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby").

("post-trial relief may not be granted unless the grounds therefor . . . are specified in the motion. Grounds not specified are deemed waived unless leave is granted upon cause shown to specify additional grounds"); *Diamond Reo Truck Co. v. Mid-Pacific Indus., Inc.*, 806 A.2d 423, 428 (Pa. Super. 2002) ("[i]f an issue has not been raised in a post-trial motion, it is waived for appeal purposes") (internal quotations and citations omitted). Moreover, even though Appellant included the claim in her "brief in support of post-trial motion," a brief is not a motion. Thus, Appellant's inclusion of the claim in her brief did not preserve the claim of error.[5] *Commonwealth v. Gravely*, 404 A.2d 1296, 1297 (Pa. 1979) (declaring: issues that were omitted from the post-verdict motion are waived, even if they were contained in the supporting brief and considered by the trial court); *Cherry v. Willer*, 463 A.2d 1082, 1084 (Pa. Super. 1983) ("only issues specifically raised in post-verdict motions can be considered and will be preserved for appeal, and issues raised only in briefs in support of those motions may not be considered"); *In re Trust of Bachman*, 488 A.2d 27, 29 (Pa. Super. 1985) ("issues not included in exceptions or petitions will not be preserved by virtue of their having been argued in the supporting brief or at oral argument"); *Siculietano v. K & B Amusements Corp.*, 915 A.2d 130,

_____

[5] Further, Appellant filed her brief over one month after the verdict in this case. *See* Pa.R.C.P. 227.1(c)(1) ("[p]ost-trial motions shall be filed within ten days after . . . verdict").

132-133 (Pa. Super. 2006) (even though appellants raised their claim in their brief in support of post-trial motion, the claim was waived on appeal because appellants failed to specifically raise the claim in their post-trial motion). Therefore, the claim is waived.

The only claim that Appellant properly preserved for appeal is her claim that the trial court erred in denying her motions *in limine* and "admit[ting] character evidence of Rhoda Baldwin's past noncompliance with taking her medications." Appellant's Brief at 7. This claim fails.

"When reviewing a ruling on a motion *in limine*, we apply an evidentiary abuse of discretion standard of review." ***Commonwealth v. Parker***, 104 A.3d 17, 21 (Pa. Super. 2014) (citation omitted).

> Admission of evidence is within the sound discretion of the trial court and a trial court's rulings on the admission of evidence will not be overturned absent an abuse of discretion or misapplication of law. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.
>
> To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. . . . A party suffers prejudice when the trial court's error could have affected the verdict.

***Schuenemann v. Dreemz, LLC***, 34 A.3d 94, 100-101 (Pa. Super. 2011) (internal quotations and citations omitted); ***see also B & L Asphalt Indus. v. Fusco***, 753 A.2d 264, (Pa. Super. 2000) ("[a]n evidentiary ruling which

[does] not affect the verdict will not provide a basis for disturbing the fact-finder's judgment") (internal quotations, citations, and corrections omitted).

In the case at bar, Appellant's claim immediately fails because – even assuming, *arguendo*, that the trial court erred in admitting evidence of Ms. Baldwin's past noncompliance with taking her medication – the asserted error was harmless.

Here, "evidence of Rhoda Baldwin's past noncompliance with taking her medications" could only have affected the issues of causation and comparative negligence. Yet, the jury in this case specifically found that Dr. Assefa and Aster Assefa, M.D., P.C. were not negligent. Thus, as to the effect of the challenged evidence on Ms. Baldwin's comparative negligence, the admission of the evidence could not have affected the verdict because, under Pennsylvania law, "where a jury finds no negligence on the part of a defendant, purported error regarding questions of comparative and/or contributory negligence are not prejudicial and cannot serve as a basis for the award of a new trial." ***Boyle v. Indep. Lift Truck, Inc.***, 6 A.3d 492, 496 (Pa. 2010) (citations omitted); ***Whitton v. H.A. Gable Co.***, 200 A. 644, 646 (Pa. 1938) ("as the jury found no negligence on the part of appellee the question of contributory negligence passes out of the case, and any error in the charge in this respect would not have been prejudicial").

Further, as to the effect of the challenged evidence on the issue of causation, again, the jury found that Dr. Assefa and Aster Assefa, M.D., P.C. were not negligent. Therefore, as a matter of law, the evidence could not

have impacted the jury's determination regarding whether Dr. Assefa and Aster Assefa, M.D., P.C. deviated from the standard of care in the treatment of Ms. Baldwin. The asserted error is, thus, harmless. ***See Parr v. Ford Motor Co.***, 109 A.3d 682, 697 (Pa. Super. 2014) (*en banc*) (error in admission of causation evidence was harmless as the jury did not reach the issue of causation).

Accordingly, the admission of evidence regarding Ms. Baldwin's past noncompliance with taking her medications did not contribute to the jury's verdict. As any error in admitting the challenged evidence was harmless, Appellant is not entitled to relief.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/17/2016